**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| ELECTROLUX CONSUMER PRODUCTS, INC., | ) | CASE NO.: 1:26cv28376 |
| Plaintiff, | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| CYBER DEALS360 LLC, | ) | |
| Defendant. | ) | |

**COMPLAINT FOR PATENT INFRINGEMENT, TRADEMARK INFRINGEMENT, AND UNFAIR COMPETITION**

Plaintiff Electrolux Consumer Products, Inc. ("Electrolux" or "Plaintiff"), by and through its undersigned counsel, alleges as follows:

**NATURE OF THE ACTION**

1. Plaintiff brings this action against Defendant Cyber Deals360 LLC ("CD360" or "Defendant") for: 1) patent infringement under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, and 2) trademark infringement and counterfeiting, false designation of origin, and unfair competition under the Lanham Act, 15 U.S.C. 1051 *et seq.*

2. Plaintiff Electrolux owns the famous Frigidaire® brand, under which it designs, tests, and sells billions of dollars of appliances in North America. Frigidaire® refrigerators comprise a substantial portion of Plaintiff Electrolux's sales, and the popular and higher-end refrigerator models include systems to dispense filtered drinking water and ice. The water filters for these refrigerators, which can retail for over $50, are replaced every 6 months on average. Filter sales, therefore, comprise a significant portion of Plaintiff Electrolux's sales.

3. Electrolux protects its Frigidaire® brand, as well as its water filter products, with an array of intellectual property that includes patents and trademarks. Electrolux sells its water filter products under a variety of specific brands, including the federally registered PUREPOUR mark.

4. KX Technologies LLC ("KXT") is the owner of certain water filter utility patents (the "Push Push Filter Patents") that disclose water filter cartridges installed by pushing the water filter into a manifold in a refrigerator to engage and disengage the water filter from the manifold (the "Push Push Filters"). A subset of five of the Push Push Filter Patents covering the Push Push Filters are asserted against Defendant CD360 in this action. Electrolux is the exclusive licensee of the Push Push Filter Patents, and KXT is the exclusive supplier to Electrolux of the Push Push Filters.

5. Plaintiff Electrolux is the owner by assignment of certain design patents protecting the ornamental design of its water filter products. Two of those design patents covering the ornamental design of Electrolux's PUREPOUR-branded filters are asserted against Defendant CD360 in this action.

6. Defendant CD360 imports, markets, offers for sale, sells, and/or uses its counterfeit refrigerator water filter products that infringe the Push Filter Patents and design patents asserted in this action.

7. Defendant CD360 infringes Electrolux's federally registered FRIGIDAIRE and PUREPOUR marks by using in commerce reproductions, copies, and colorable imitations of Electrolux's federally registered marks, including by importing, marketing, offering for sale and/or selling refrigerator water filter products that incorporate and display the federally registered marks.

# PARTIES

## A. Electrolux Consumer Products, Inc.

8. Electrolux is a corporation organized under the laws of Delaware with a place of business at 10200 David Taylor Drive, Charlotte, NC 28262.

9. Electrolux is a U.S. subsidiary of Electrolux North America, Inc., which is a subsidiary of AB Electrolux (these and other related companies are under the umbrella "Electrolux Group"), a Swedish home-appliance manufacturer. Electrolux Group, founded in 1919, is a world-renowned household and professional appliance manufacturer. Through its brands, including Electrolux, AEG, Anova, Frigidaire, Westinghouse and Zanussi, Electrolux Group sells more than 60 million household and professional products, including refrigerators, dishwashers, washing machines, cookers, vacuums cleaners, air conditioners and small domestic appliances in more than 150 markets every year. With offices in over 60 countries, Electrolux Group today employs approximately 55,000 people in every major region of the world.

10. Electrolux is the owner of the famous Frigidaire® brand, which is used to market appliances including the Frigidaire® line of refrigerators. Frigidaire® refrigerators have been substantially designed, engineered, tested, and validated in the United States.

## B. Cyber Deals360 LLC

11. Upon information and belief, Cyber Deals360 LLC is a Florida limited liability company having its principal place of business at 11930 NE 16th Ave., Apt. 208, Miami, FL 33161. CD360 may be served through its designated agent: Republic Registered Agent LLC, 476 Riverside Ave., Suite 4, Jacksonville, FL 32202.

## JURISDICTION AND VENUE

12. This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.* and trademark infringement, trademark counterfeiting, false designation of origin, and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.*

13. This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a).

14. This Court has personal jurisdiction over CD360 because CD360 is incorporated under the laws of the State of Florida and has its principal place of business in this District.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b) because CD360 resides in this District for purposes of venue.

## ELECTROLUX'S FEDERALLY REGISTERED TRADEMARKS

16. Electrolux owns a valid and subsisting registration on the Principal Register of the United States Patent and Trademark Office for the FRIGIDAIRE Mark: U.S. Reg. No. 616,196, for the standard-character mark FRIGIDAIRE in International Class 11, covering: Refrigerators, mechanical refrigerating apparatuses of all types both household and commercial, and parts thereof; registered November 15, 1955, reflecting first use in commerce at least as early as September 21, 1918. A copy of the registration certificate for FRIGIDAIRE Mark registration, U.S. Reg. No. 616,196, is attached as Exhibit 1.

17. Electrolux has used, and continues to use, the FRIGIDAIRE Mark in commerce in connection with the goods identified in U.S. Reg. No. 616,196 since at least as early as September 21, 1918.

18. Electrolux owns a valid and subsisting registration on the Principal Register of the United States Patent and Trademark Office for the FRIGIDAIRE Mark: U.S. Reg. No. 7,850,190, for the standard-character mark FRIGIDAIRE in International Class 11, covering: Water filtration

and purification units and replacement cartridges and filters therefor for use in refrigerators, freezers and combinations thereof; registered July 1, 2025, reflecting first use in commerce at least as early as March 31, 2009. A copy of the registration certificate for FRIGIDAIRE Mark registration, U.S. Reg. No. 7,850,190, is attached as Exhibit 2.

19. Electrolux has used, and continues to use, the FRIGIDAIRE Mark in commerce in connection with the goods identified in U.S. Reg. No. 7,850,190 since at least as early as March 31, 2009.

20. The FRIGIDAIRE Mark is inherently distinctive and/or has acquired distinctiveness. The registrations constitute prima facie evidence of the validity of the mark, of Electrolux's ownership of the mark, and of Electrolux's exclusive right to use the mark in commerce in connection with the goods and services identified therein.

21. Moreover, U.S. Reg. No. 616,196 for the FRIGIDAIRE Mark is incontestable pursuant to 15 U.S.C. § 1065. The mark has been registered on the Principal Register and in continuous use in commerce for five consecutive years following its November 15, 1955, registration date and remains in use. Electrolux has filed the affidavit required by 15 U.S.C. § 1065. There has been no final decision adverse to Electrolux's ownership of, or right to register or maintain, the mark, nor any proceeding involving those rights pending before the United States Patent and Trademark Office or a court. Accordingly, and pursuant to 15 U.S.C. §§ 1065 and 1115(b), the registration is conclusive evidence of the validity of the FRIGIDAIRE Mark and of its registration, of Electrolux's ownership of the mark, and of Electrolux's exclusive right to use the mark in commerce in connection with the goods identified in the registration.

22. Electrolux also owns and enjoys common-law rights in the FRIGIDAIRE Mark by virtue of its continuous use in interstate commerce since at least as early as November 15, 1955, and March 31, 2009.

23. Electrolux owns a valid and subsisting registration on the Principal Register of the United States Patent and Trademark Office for the PUREPOUR Mark: U.S. Reg. No. 6,169,980, for the standard-character mark PUREPOUR in International Class 11, covering: Water filtration and purification units and replacement cartridges and filters therefor for refrigerators, freezers and combinations thereof; registered October 6, 2020, reflecting first use in commerce at least as early as May 1, 2020. A copy of the registration certificate for PUREPOUR Mark registration is attached as Exhibit 3.

24. Electrolux has used, and continues to use, the PUREPOUR Mark in commerce in connection with the goods identified in U.S. Reg. No. 6,169,980 since at least as early as May 1, 2020.

25. The PUREPOUR Mark is inherently distinctive and/or has acquired distinctiveness. The registration constitutes prima facie evidence of the validity of the mark, of Electrolux's ownership of the mark, and of Electrolux's exclusive right to use the mark in commerce in connection with the goods and services identified therein.

26. Electrolux also owns and enjoys common-law rights in the PUREPOUR Mark by virtue of its continuous use in interstate commerce since at least as early as May 21, 2020.

## WATER FILTER TECHNOLOGY

### A. Background Technology

27. In general, a water filter is a device that removes impurities in a fluid stream by lowering contamination in the water using a fine physical barrier, an electrical attraction, a chemical process, a biological process, or a combination thereof. Activated carbon granules based

on charcoal, wood, and/or coconut shells represent a preferred filter media. The filter media is generally encapsulated within a filter housing that is releasably connected to a manifold in-line with the fluid stream. There are mechanical, adsorptive, oxidizing, and neutralizing filters, available as media beds in tanks, or as cartridge-type devices, such as the Electrolux filters that practice the Push Push Filter Patents.

28. Activated carbon remains the primary material used in point-of-use/point-of-entry (POU/POE) water treatment devices for the control of physical contaminants (sediments, suspended organic material), chemical contaminants (nitrogen, bleach, slats, heavy metals, pesticides, toxins produced by bacteria, human drugs, and animal drugs), biological contaminants (microbiological organisms, bacteria, viruses, protozoan, and parasites), and radiological contaminants (cesium, plutonium, and uranium).

29. The carbon is processed (extruded) into blocks generally using proprietary binder systems and manufacturing techniques to produce filters with a greater number of micropores and available carbon surface area, which ultimately display superior adsorption capacity and kinetic dynamics. The activated carbon particles may also be processed on pleated filter paper housed in the filter cartridge housing cavity.

30. The filter housing encloses the filter media in a manner that allows for ingress fluid to pass through the media and filtered egress fluid to exit the filter media without mixing with the ingress fluid. The filter housing is designed to a) mate with a filter manifold that puts the filter housing (and filter media) in fluid communication with the fluid lines b) in a way that consumers are able to install and uninstall with ease.

31. KXT and Electrolux have protected the filter cartridges, methods of using the filter cartridges, and filter cartridge designs, through enforcement of the Push Push Filter Patents, Electrolux's design patents, and Electrolux's trademarks.

## B. KXT's Innovations in Water Filter Technology

32. For over 30 years, KXT has delivered unique and innovative products that set the bar for the rest of the industry. KXT has earned its reputation by providing unique, innovative solutions for some of the world's leading manufacturers. KXT sells more carbon filters to more Original Equipment Manufacturers (OEM) than anyone in the world.

33. Years of collaboration with customers has left KXT with a long list of breakthroughs, accomplishments, and innovations in filtration technology including:

- First to extrude activated carbon block filters;
- First refrigerator cassette water filter;
- First installed refrigerator air/odor filter;
- First cassette water cooler filter;
- First OEM Point-of-Use water filter with microbiological health claims; and
- First refrigerator water filter with microbiological health claims.

34. KXT operates one of the world's largest solid-state extrusion facilities for the production of activated carbon filters. The facility is equipped to offer a wide range of standard and custom diameters, and lengths available to fit almost any filter application.

35. All of KXT's extruded carbon filters are manufactured using FDA-compliant materials, and can be used in potable water applications, as well as for industrial, food service, and commercial applications.

36. KXT personnel invented, designed, developed, engineered, tested, and validated the Push Push Filters in West Haven, Connecticut.

### C. Genuine Electrolux Water Filters Made by KXT Meet Exacting Safety and Purification Standards

37. All KXT manufactured products, including all Electrolux water filters sourced from KXT, undergo extensive internal testing and are subjected to production and quality assurance programs.

38. All KXT products, including all Electrolux water filters sourced from KXT, meet the regulatory requirements put into place by California Proposition 65, "The Safe Drinking Water and Toxic Enforcement Act of 1986."

39. In addition, KXT products meet regulatory requirements in many countries around the globe including China, Brazil, Mexico, India, the United Kingdom, and the European Union.

40. Electrolux and KXT work closely together to ensure that every Electrolux water filter meets each of these exacting safety and purification standards.

### D. The United States International Trade Commission Investigation to Enjoin Widespread Infringement of KXT's Patents and Counterfeiting of Electrolux's Water Filters

41. Electrolux and KXT have battled widespread infringement of their water filter intellectual property for years against both counterfeit and private label filters. These unlawful filters are sold at price points substantially below authentic Electrolux filters, causing extensive lost sales and profits. Moreover, these filters can be of lower quality than Electrolux's authentic filters in terms of water filtration and fit. Consequently, Electrolux has received numerous complaints from customers experiencing problems caused by the inauthentic filters, believing them to be genuine replacement filters. The vast majority of these filters are produced abroad,

mainly in China, and are imported and sold by anonymous, pseudonymous, and private label sellers in the United States on an array of online platforms.

42. To combat the widespread infringement of their water filter intellectual property, KXT and Electrolux requested the United States International Trade Commission ("ITC") investigate the infringement of certain KXT patents that protect the Push Push Filters (the "ITC Asserted Patents")[1], including three patents asserted in this action. The ITC instituted Investigation No. 337-TA-1126 to investigate KXT and Electrolux's claims.

43. While the Investigation named eight parties as respondents, countless additional parties were selling under pseudonymous names on online platforms such as Alibaba.com, Amazon.com, and eBay.com, that could not be named. To address vast scale of infringement, KXT and Electrolux requested the ITC to issue a general exclusion order ("GEO").

44. During the investigation, three named parties defaulted, and five parties settled. The settling parties entered into cease-and-desist orders ("CDOs") agreeing to cease importing, or selling for or after importation, products that infringe the asserted claims of the ITC Asserted Patents or encourage others to do the same.

45. The ITC found that the products accused in the ITC investigation infringed ITC Asserted Patents. On July 11, 2019, the Administrative Law Judge ("ALJ") issued an Initial Determination finding that the defaulting respondents infringed one or more claims of each of the ITC Asserted Patents. On August 23, 2019, the ITC issued a Notice of its intention to review the ALJ's Initial Determination only to the extent of correcting a citation error and two typos. Upon

[1] U.S. Patent Nos. 8,673,146; 8,137,551; 9,233,322; and 9,901,852 were asserted in the ITC action.

the decision not to review the ALJ's findings and conclusions regarding infringement, the ALJ's Initial Determination became the determination of the ITC on that issue.

46. On November 12, 2019, the ITC issued a Notice of its issuance of a GEO as well as CDOs against two defaulting respondents ("Final Notice"). That Final Notice was published in the Federal Register at 84 FR 63676 on November 18, 2019. A copy of the Commission's Notice as published in the Federal Register is attached as Exhibit 4.

47. On November 15, 2019, the ITC issued its Opinion setting forth the basis for its determination to issue a GEO and CDOs to two defaulting respondents. In its Opinion, the ITC determined that numerous unnamed, pseudonymous, and anonymous parties were infringing the ITC Asserted Patents. To prevent continued infringement of the ITC Asserted Patents, the ITC determined to issue a GEO to prohibit importation and sale for or after importation of articles that infringed the ITC Asserted Patents from any source whatsoever, whether or not the party was named in the ITC complaint. The sweeping relief was warranted, the ITC found, because the trade channels for the infringing articles were opaque and infringers were likely to circumvent the ITC's remedial orders without it. A copy of the Commission's Opinion is attached as Exhibit 5.

48. Separately and collectively, the Commission's Opinion and Final Notice provided notice of the ITC's GEO prohibiting unfair acts in connection with the importation and sale for or after importation of articles that infringe the ITC Asserted Patents, including three patents asserted in this action, as well as one more related KXT patents. Collectively, the ITC's Final Notice, Opinion, and the determinations, orders, and notices identified therein provided notice to the public of the ITC Asserted Patents and Electrolux's rights therein.

## E. The Push Push Filter Inventions

49. Each asserted Push Push Filter Patent is related, and so the following description is generally applicable to each asserted Push Push Filter Patent.

50. The inventions of the Push Push Filter Patents are useful as the water filtering system for a refrigerator having water dispensing means. The water filtration system is adaptable for removing rust, sand, silt, sediment, heavy metals, microbiological contaminants, and other known contaminants in water.

51. The Push Push Filter Patents collectively teach: a) a filter assembly having a push-activated lock and release mechanism; and b) a method for insertion and removal of a filter assembly having a push-activated lock and release mechanism. The push filter design activates a movable ("floating") lock within the filter assembly manifold or base upon insertion of a filter key attached to a replaceable filter cartridge. The filter cartridge is attached to, and removed from, the filter base by a push-actuated release.

52. The filter housing assembly provides simplified filter changes to minimize process downtime and without recourse to tools, and minimize the force required for installation and removal while eliminating any twisting action. A simple push mechanism actuates the self-driving release and change over means that hold and release the filter housing sump or filter cartridge, and provides influent shutoff means to prevent leaking and spillage. A floating lock or movable sliding lock responsive to an axial insertion force from the filter cartridge moves perpendicular (or radially) to the axial motion of the sump and allows a specific filter key to insert within the floating lock. Once inserted, the floating lock retracts towards its original position under a resilient force, such as two springs in tandem, or other complementary resilient mechanism, keeping the floating lock under retraction tension when moved from its initial position.

53. Removal of the filter cartridge is performed in the same manner. An axial insertion force causes the floating lock to move perpendicular to the axial direction (radially outwards), which allows the filter key to be removed from the floating lock. An extraction force provided by spring tension, or the like, helps push the filter cartridge out of its base. Fluid shutoff and locking mechanisms are initiated by the axial force on the filter cartridge at the commencement of the filter changing procedure.

54. The claimed filter generally includes a filter housing assembly that includes a filter housing (used to enclose a filter media) having a top portion which includes ingress and egress ports, and a filter key.

55. In at least one embodiment, the filter key includes a top surface, longitudinal and lateral sides, and one or more fingers.

56. This unique attachment structure promotes the quick and simple insertion and extraction (preferably with one hand operation) of a refrigerator water filter.

## F. The Asserted Utility Patents

57. KXT is the owner by assignment of all right, title, and interest in U.S. Patent Nos. 8,673,146 (the "'146 Patent"), 9,233,322 (the "'322 Patent"), 9,901,852 (the "'852 Patent"), 10,675,571 (the "'571 Patent"), and 10,857,492 (the "'492 Patent") (collectively, the "Asserted Utility Patents").

58. Through a written and duly executed Exclusive Patent License Agreement, dated November 21, 2017, as successor-in-interest to Electrolux Home Products, Electrolux holds an exclusive right and license under the Asserted Utility Patents to distribute, offer for sale, and/or sell products covered by the Asserted Utility Patents in the field of use of refrigerator applications.

Electrolux further holds the right to bring suit for infringement of the Asserted Utility Patents by a third party if KXT elects not to bring suit itself against such infringement.

59. Electrolux possesses all substantial rights and exclusionary rights in the Asserted Utility Patents necessary to maintain this action.

60. The ’146 Patent, entitled “Push Filter with Floating Key Lock,” was duly and legally issued by the United States Patent and Trademark Office (“USPTO”) on March 18, 2014. The ’146 Patent issued from United States Patent Application No. 13/645,726, filed October 5, 2012. A copy of the ’146 Patent is attached as Exhibit 6.

61. The ’322 Patent, entitled “Push Filter with Floating Key Lock,” was duly and legally issued by the USPTO on January 12, 2016. The ’322 Patent issued from United States Patent Application No. 14/053,086, filed October 14, 2013. A copy of the ’322 Patent is attached as Exhibit 7.

62. The ’852 Patent, entitled “Push Filter with Floating Key Lock,” was duly and legally issued by the USPTO on February 27, 2018. The ’852 Patent issued from United States Patent Application No. 14/800,725, filed July 16, 2015. A copy of the ’852 Patent is attached as Exhibit 8.

63. The ’571 Patent, entitled “Filter Housing with Filter Key Attachment,” was duly and legally issued by the USPTO on June 9, 2020. The ’571 Patent issued from the United States Patent Application No. 15/881,324, filed January 26, 2018. A copy of the ’571 Patent is attached as Exhibit 9.

64. The ’492 Patent, entitled “Push Filter with Floating Key Lock,” was duly and legally issued by the USPTO on December 8, 2020. The ’492 Patent issued from United States

Patent Application No. 16/235,134, filed December 28, 2018. A copy of the ’492 Patent is attached as Exhibit 10.

### G. The Asserted Design Patents

65. Plaintiff Electrolux owns by assignment the entire right, title, and interest in U.S. Design Patent No. D946,699 (the “D699 Patent”), entitled FILTER CARTRIDGE, which issued on March 22, 2022. The D699 Patent issued from United States Patent Application No. 29/713,699, filed November 18, 2019. A copy of the D699 Patent is attached as Exhibit 11.

66. The D699 Patent discloses and claims the non-functional, ornamental design for a filter cartridge as shown below (Figs. 1, 3, and 5), as well as the D699 Patent’s other figures:




FIG. 1




FIG. 3




FIG. 5

67. Plaintiff Electrolux owns by assignment the entire right, title, and interest in U.S. Design Patent No. D946,702 (the "D702 Patent" or collectively with the D699 Patent the "Asserted Design Patents"), entitled FILTER CARTRIDGE, which issued on March 22, 2022. The D702

Patent issued from United States Patent Application No. 29/713,708, filed November 18, 2019. A copy of the D702 Patent is attached as Exhibit 12.

68. The D702 Patent discloses and claims the non-functional, ornamental design for a filter cartridge as shown below (Figs. 1, 2, and 3), as well as the D702 Patent's other figures:




FIG. 1



FIG. 2




FIG. 3

## H. The Push Push Filters

69. Under the famous Frigidaire® brand, Electrolux markets and sells multiple refrigerator water filter products that practice one or more claims of the Asserted Utility Patents, including the PUREPOUR® Water and Ice Refrigerator Filter PWF-1™ (https://www.frigidaire.com/en/p/accessories/refrigerator-accessories/refrigerator-accessories-and-consumables/water-filters/FPPWFU01), the PUREPOUR Connect® PWF-2™ Water and Ice Refrigerator Filter (https://www.frigidaire.com/en/p/accessories/refrigerator-accessories/refrigerator-accessories-and-consumables/water-filters/FPPWFU02), the PureSource Ultra® Water and Ice Refrigerator Filter (https://www.frigidaire.com/en/p/accessories/refrigerator-accessories/refrigerator-accessories-and-consumables/water-filters/ULTRAWF), and PureSource® 3 Water and Ice Refrigerator Filter (https://www.frigidaire.com/en/p/accessories/refrigerator-accessories/refrigerator-accessories-and-consumables/water-filters/WF3CB). Electrolux also markets and sells the PureAdvantage® Water and Ice Refrigerator PWF-1™ Filter

(https://www.frigidaire.com/en/p/accessories/refrigerator-accessories/refrigerator-accessories-and-consumables/water-filters/EPPWFU01) that practices one or more claims of the Asserted Utility Patents under its Electrolux brand.

70. Under the famous Frigidaire® brand, Electrolux markets and sells multiple refrigerator water filter products that practice one or more of the Asserted Design Patents, including the PUREPOUR® Water and Ice Refrigerator Filter PWF-1™ (https://www.frigidaire.com/en/p/accessories/refrigerator-accessories/refrigerator-accessories-and-consumables/water-filters/FPPWFU01) and the PUREPOUR Connect® PWF-2™ Water and Ice Refrigerator Filter (https://www.frigidaire.com/en/p/accessories/refrigerator-accessories/refrigerator-accessories-and-consumables/water-filters/FPPWFU02). Electrolux also markets and sells the PureAdvantage® Water and Ice Refrigerator PWF-1™ Filter (https://www.frigidaire.com/en/p/accessories/refrigerator-accessories/refrigerator-accessories-and-consumables/water-filters/EPPWFU01) that practices the Asserted Design Patent under its Electrolux brand.

71. Electrolux also uses a double water droplet design ("Electrolux Droplet Design") on products, including the PUREPOUR® Water and Ice Refrigerator Filter PWF-1™, to act as signifier of Electrolux.

72. The Electrolux Droplet Design is shown below.



73. KXT is the exclusive supplier to Electrolux of the foregoing products.

**DEFENDANT'S INFRINGING PRODUCTS**

74. CD360 has imported, marketed, advertised, offered for sale, sold, and/or used and, on information and belief, will continue to import, market, advertise, offer for sale, sell, and/or use in the United States refrigerator water filter products that infringe the Asserted Utility Patents, the Asserted Design Patents, and Electrolux's federally registered FRIGIDAIRE Mark and PUREPOUR Mark.

75. CD360 has marketed, advertised, offered for sale, and sold and, on information and belief, will continue to import, market, advertise, offer for sale, sell, and/or use in the United States a water filter product marketed as a Frigidaire PurePour Water and Ice Refrigerator Filter PWF-1 ("Counterfeit Accused Product"), including through the Amazon.com website. See, e.g., (XXX).

76. Electrolux personnel ordered an example of the Counterfeit Accused Product from the Amazon.com website on August 28, 2026. The Counterfeit Accused Product was received August 31, 2026.

77. Shipping information on the packaging indicated that the Counterfeit Accused Product was shipped from 11930 NE 16th Ave., Apt. 208, Miami, FL 33161, CD360's principal place of business as registered with the California Secretary of State.

78. Photographs of the packaging of the Counterfeit Accused Product are attached as Exhibit 13.

79. The packaging of the Counterfeit Accused Product copies a version of Electrolux's packaging for its PUREPOUR® filter product.

80. The packaging of the Counterfeit Accused Product includes both the registered FRIGIDAIRE Mark and the registered PUREPOUR Mark.

81. Photographs of the Counterfeit Accused Product are attached as Exhibit 14.

82. The labeling of the Counterfeit Accused Product copied a version of Electrolux's labeling for its PUREPOUR® filter product.

83. The labeling of the Counterfeit Accused Product includes both the registered FRIGIDAIRE Mark and the registered PUREPOUR Mark.

84. Based on several indicia, Electrolux personnel determined that the Counterfeit Accused Product shown in Exhibit 14 is not a genuine Electrolux-supplied product.

85. On September 28, 2026, Electrolux submitted a takedown request to Amazon.com requesting that the listing of the Counterfeit Accused Product be removed on the basis of the '146 patent.

86. In response to the takedown request, CD360 submitted what purported to be a letter of authorization from Electrolux authorizing CD360 to use Electrolux's intellectual property in connection with the marketing, advertising, listing, and sale of the Counterfeit Accused Product. CD360 further submitted what purported to be an invoice showing CD360's purchase of 450 units

of Electrolux's PurePour® refrigerator water filter, as well as bundled air filters, from Electrolux. Both the letter of authorization and the invoice are inauthentic forgeries. Electrolux never issued the purported invoice or letter of authorization to CD360. Copies of the forged letter of authorization and invoice as attached as Exhibits 15 and 16.

87. The Counterfeit Accused Product practices, without license, one or more claims of the Asserted Utility Patents.

88. The Counterfeit Accused Product practices, without license, the Asserted Design Patents. The overall appearances of the design of the Asserted Design Patents and the corresponding design of the Counterfeit Accused Product are substantially the same. An ordinary observer will perceive the overall appearances of the design of the Asserted Design Patents and the corresponding design of the Counterfeit Accused Product to be substantially the same.

89. The Counterfeit Accused Product includes the Electrolux Droplet Design on the bottom of the product.



**COUNT I – INFRINGEMENT OF U.S. PATENT NO. 8,673,146**
**(35 U.S.C. § 271)**

90. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

91. CD360 is not licensed or authorized to practice the inventions claimed in the ’146 Patent.

92. Upon information and belief, CD360 has infringed claims of the ’146 Patent, including at least claims 1-3 and 6-7, in violation of 35 U.S.C. § 271(a) by importing, selling, offering to sell, making, using, and/or providing and causing to be used the Counterfeit Accused Product.

93. Exemplary infringement analysis showing infringement of claims 1-3 and 6-7 by the Counterfeit Accused Product is set forth in Exhibit 17. This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by CD360 with respect to the ’146 Patent. Plaintiff reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the ’146 Patent.

94. The Counterfeit Accused Product has infringed, and continued importation, sales, offers to sell, making, using, and/or providing and causing the Counterfeit Accused Product to be used will continue to infringe claims 1-3 and 6-7 of the ’146 Patent during the pendency of the ’146 Patent.

95. CD360 had constructive notice of Plaintiff’s rights in the ’146 Patent by virtue of Plaintiff’s patent marking practices, and the ITC’s Notice publication in the Federal Register that

products infringing the patents asserted in the ITC Investigation were unlawful and excluded from entry into the United States.

96. CD360 had actual notice of Plaintiff's rights in the '146 patent at least as early as September 30, 2026, when Amazon.com notified CD360 of Electrolux's requested take-down.

97. Plaintiff has been harmed by CD360's infringing activities.

98. Plaintiff is entitled to recover monetary damages for the injuries arising from CD360's infringement in an amount to be determined at trial.

99. CD360's infringement has been and continues to be willful, intentional, in bad faith, and with knowledge of the '146 Patent.

100. CD360's conduct has caused and, absent relief, will continue to cause Plaintiff irreparable harm for which there is no adequate remedy at law.

101. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief.

**COUNT II – INFRINGEMENT OF U.S. PATENT NO. 9,233,322**
**35 U.S.C. § 271**

102. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

103. CD360 is not licensed or authorized to practice the inventions claimed in the '322 Patent.

104. Upon information and belief, CD360 has infringed claims of the '322 Patent, including at least claims 1-3, 7-9, and 12-15, in violation of 35 U.S.C. § 271(a) by importing, selling, offering to sell, making, using, and/or providing and causing to be used the Counterfeit Accused Product.

105. Exemplary infringement analysis showing infringement of claims 1-3, 7-9, and 12-15 by the Counterfeit Accused Product is set forth in Exhibit 18. This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by CD360 with respect to the ’322 Patent. Plaintiff reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the ’322 Patent.

106. The Counterfeit Accused Product have infringed, and continued importation, sales, offers to sell, making, using, and/or providing and causing the Counterfeit Accused Product to be used will continue to infringe claims 1-3, 7-9, and 12-15 of the ’322 Patent during the pendency of the ’322 Patent.

107. CD360 had constructive notice of Plaintiff’s rights in the ’322 Patent by virtue of Plaintiff’s patent marking practices, and the ITC’s Notice publication in the Federal Register that products infringing the patents asserted in the ITC Investigation were unlawful and excluded from entry into the United States.

108. Plaintiff has been harmed by CD360’s infringing activities.

109. Plaintiff is entitled to recover monetary damages for the injuries arising from CD360’s infringement in an amount to be determined at trial.

110. CD360’s infringement has been and continues to be willful, intentional, in bad faith, and with knowledge of the 322 Patent.

111. CD360’s conduct has caused and, absent relief, will continue to cause Plaintiff irreparable harm for which there is no adequate remedy at law.

112. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief.

**COUNT III – INFRINGEMENT OF U.S. PATENT NO. 9,901,852**
**35 U.S.C. § 271**

113. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

114. CD360 is not licensed or authorized to practice the inventions claimed in the ’852 Patent.

115. Upon information and belief, CD360 has infringed claims of the ’852 Patent, including at least claims 1, 4-6, 9-11, and 21-31, in violation of 35 U.S.C. § 271(a) by importing, selling, offering to sell, making, using, and/or providing and causing to be used the Counterfeit Accused Product.

116. Exemplary infringement analysis showing infringement of claims 1, 4-6, 9-11, and 21-31 by the Counterfeit Accused Product is set forth in Exhibit 19. This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by CD360 with respect to the ’852 Patent. Plaintiff reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the ’852 Patent.

117. The Counterfeit Accused Product have infringed, and continued importation, sales, offers to sell, making, using, and/or providing and causing the Counterfeit Accused Product to be used will continue to infringe claims 1, 4-6, 9-11, and 21-31 of the ’852 Patent during the pendency of the ’852 Patent.

118. CD360 had constructive notice of Plaintiff's rights in the '852 Patent by virtue of Plaintiff's patent marking practices, and the ITC's Notice publication in the Federal Register that products infringing the patents asserted in the ITC Investigation were unlawful and excluded from entry into the United States.

119. Plaintiff has been harmed by CD360's infringing activities.

120. Plaintiff is entitled to recover monetary damages for the injuries arising from CD360's infringement in an amount to be determined at trial.

121. CD360's infringement has been and continues to be willful, intentional, in bad faith, and with knowledge of the '852 Patent.

122. CD360's conduct has caused and, absent relief, will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law.

123. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief.

**COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 10,675,571**
**35 U.S.C. § 271**

124. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

125. CD360 is not licensed or authorized to practice the inventions claimed in the '571 Patent.

126. Upon information and belief, CD360 has infringed claims of the '571 Patent, including at least claims 7-13, in violation of 35 U.S.C. § 271(a) by importing, selling, offering to sell, making, using, and/or providing and causing to be used the Counterfeit Accused Product.

127. Exemplary infringement analysis showing infringement of claims 7-13 by the Counterfeit Accused Product is set forth in Exhibit 20. This infringement analysis is necessarily

preliminary, as it is provided in advance of any discovery provided by CD360 with respect to the ’571 Patent. Plaintiff reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the ’571 Patent.

128. The Counterfeit Accused Product have infringed, and continued importation, sales, offers to sell, making, using, and/or providing and causing the Counterfeit Accused Product to be used will continue to infringe claims 7-13 of the ’571 Patent during the pendency of the ’571 Patent.

129. CD360 had constructive notice of Plaintiff’s rights in the ’571 Patent by virtue of Plaintiff’s patent marking practices, and the ITC’s Notice publication in the Federal Register that products infringing the patents asserted in the ITC Investigation were unlawful and excluded from entry into the United States.

130. Plaintiff has been harmed by CD360’s infringing activities.

131. Plaintiff is entitled to recover monetary damages for the injuries arising from CD360’s infringement in an amount to be determined at trial.

132. CD360’s infringement has been and continues to be willful, intentional, in bad faith, and with knowledge of the ’571 Patent.

133. CD360’s conduct has caused and, absent relief, will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law.

134. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief.

**COUNT V – INFRINGEMENT OF U.S. PATENT NO. 10,857,492**
**35 U.S.C. § 271**

135. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

136. CD360 is not licensed or authorized to practice the inventions claimed in the ’492 Patent.

137. Upon information and belief, CD360 has infringed claims of the ’492 Patent, including at least claims 1, 8-11, 14-17, 23-26, 29-31, in violation of 35 U.S.C. § 271(a) by importing, selling, offering to sell, making, using, and/or providing and causing to be used the Counterfeit Accused Product.

138. Exemplary infringement analysis showing infringement of claims 1, 8-11, 14-17, 23-26, 29-31 by the Counterfeit Accused Product is set forth in Exhibit 21. This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by CD360 with respect to the ’492 Patent. Plaintiff reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the ’492 Patent.

139. The Counterfeit Accused Product have infringed, and continued importation, sales, offers to sell, making, using, and/or providing and causing the Counterfeit Accused Product to be used will continue to infringe claims 1, 8-11, 14-17, 23-26, 29-31 of the ’492 Patent during the pendency of the ’492 Patent.

140. CD360 had constructive notice of Plaintiff’s rights in the ’492 Patent by virtue of the ITC’s Notice publication in the Federal Register that products infringing the patents asserted in the ITC Investigation were unlawful and excluded from entry into the United States.

141. Plaintiff has been harmed by CD360’s infringing activities.

142. Plaintiff is entitled to recover monetary damages for the injuries arising from CD360’s infringement in an amount to be determined at trial.

143. CD360’s infringement has been and continues to be willful, intentional, in bad faith, and with knowledge of the ’492 Patent.

144. CD360’s conduct has caused and, absent relief, will continue to cause Plaintiffs irreparable harm for which there is no adequate remedy at law.

145. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief.

**COUNT VI – INFRINGEMENT OF U.S. PATENT NO. D946,699**
**35 U.S.C. § 271**

146. A Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

147. The D699 Patent claims a non-functional, ornamental design for a filter cartridge.

148. The Counterfeit Accused Product is a filter cartridge that embodies the design covered by the D699 Patent and thus infringes the D699 Patent. As shown in the table below, the Counterfeit Accused Product has appropriated the ornamental design for a filter cartridge as shown and described in the D699 Patent.

| D699 Patent | Counterfeit Accused Product |
|---|---|

| | |
|---|---|
|  | FRIGIDAIRE<br>FPPWFU01 \| PWF-1<br>Replace Every 6 Months.<br> |
| 10 | FRIGIDAIRE<br>FPPWFU01 \| PWF-1<br>Replace Every 6 Months. |

| | |
|---|---|
|  |  |

149. In the eye of an ordinary observer, giving such attention as a purchaser usually gives, the non-functional ornamental design for a filter cartridge claimed in the D699 Patent and the Counterfeit Accused Product are substantially the same, with resemblance such as to deceive an ordinary observer, inducing them to purchase Counterfeit Accused Product supposing it to be the design claimed in the D699 Patent.

150. CD360 has not been granted a license or any other rights to offer for sale, sell, or import the Counterfeit Accused Product.

151. CD360, without authorization, has offered for sale, sold, and/or imported in or into the United States, and continues to offer for sale, sell, and/or import into the United States the Counterfeit Accused Product that embodies the design covered by the D699 Patent. CD360 thus directly infringes the D699 Patent.

152. By the foregoing acts, CD360 has directly infringed and continues to infringe the D699 Patent in violation of 35 U.S.C. § 271.

153. Plaintiff has suffered and will continue to suffer damage due to CD360's infringement of the D699 Patent.

154. CD360's infringement has been and continues to be willful, intentional, in bad faith, and with knowledge of the D699 Patent.

155. CD360's conduct has caused and, absent relief, will continue to cause Plaintiff irreparable harm for which there is no adequate remedy at law.

156. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief

**COUNT VII – INFRINGEMENT OF U.S. PATENT NO. D946,702**
**35 U.S.C. § 271**

157. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

158. The D702 Patent claims a non-functional, ornamental design for a filter cartridge.

159. The Counterfeit Accused Products is a filter cartridge that embodies the design covered by the D702 Patent and thus infringes the D702 Patent. As shown in the table below, the Counterfeit Accused Product has appropriated the ornamental design for a filter cartridge as shown and described in the D702 Patent.

| D702 Patent | Counterfeit Accused Product |
| --- | --- |

| | |
|---|---|
|  10 |  FRIGIDAIRE  |
|  11 |  FRIGIDAIRE |

| | |
|---|---|
|   FIG |  |
|  |  |

160. In the eye of an ordinary observer, giving such attention as a purchaser usually gives, the non-functional ornamental design for a filter cartridge claimed in the D702 Patent and the Counterfeit Accused Product are substantially the same, with resemblance such as to deceive an ordinary observer, inducing them to purchase Counterfeit Accused Product supposing it to be the design claimed in the D702 Patent.

161. CD360 has not been granted a license or any other rights to offer for sale, sell, or import the Counterfeit Accused Product.

162. CD360, without authorization, has offered for sale, sold, and/or imported in or into the United States, and continues to offer for sale, sell, and/or import into the United States the Counterfeit Accused Product that embodies the design covered by the D702 Patent. CD360 thus directly infringes the D702 Patent.

163. By the foregoing acts, CD360 has directly infringed and continues to infringe the D702 Patent in violation of 35 U.S.C. § 271.

164. Plaintiff has suffered and will continue to suffer damage due to CD360's infringement of the D702 Patent.

165. CD360's infringement has been and continues to be willful, intentional, in bad faith, and with knowledge of the D702 Patent.

166. CD360's conduct has caused and, absent relief, will continue to cause Plaintiff irreparable harm for which there is no adequate remedy at law.

167. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief.

**COUNT VIII – INFRINGEMENT OF FEDERALLY REGISTERED TRADEMARKS**
**15 U.S.C. § 1114(1)**

168. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

169. Electrolux owns valid, subsisting, and federally registered rights in the FRIGIDAIRE Mark, Reg. No. 616,196 and Reg. No. 7,850,190. The registrations are prima facie evidence of the validity of the mark, of Electrolux's ownership, and of Electrolux's exclusive right to use the marks in commerce for the goods and services identified.

170. Without Electrolux's consent, CD360 used in commerce reproductions, copies, and colorable imitations of the registered FRIGIDAIRE Mark, including by displaying the mark in the text and headlines of sales listings, on product packaging, and on the product itself in connection with the advertising, promotion, offering, and sale of the Counterfeit Accused Product, a water filter cartridge.

171. CD360's Counterfeit Accused Product is identical or closely related to the services and goods for which the FRIGIDAIRE Mark is registered, is offered through the same channels, and is directed to the same consumers.

172. CD360's use of the FRIGIDAIRE Mark is likely to cause confusion, to cause mistake, and to deceive consumers and contractors as to the source, origin, sponsorship, affiliation, or approval of CD360's advertisements, sales listings, and goods, in violation of 15 U.S.C. § 1114(1).

173. The likelihood of confusion is confirmed by, among other things, the identity of the mark used by CD360, the relatedness of the parties' services and goods, the overlap in channels and consumers, and CD360's intent to trade on the goodwill of the FRIGIDAIRE Mark.

174. Electrolux owns valid, subsisting, and federally registered rights in the PUREPOUR Mark, Reg. No. 6,169,980. The registration is prima facie evidence of the validity of the mark, of Electrolux's ownership, and of Electrolux's exclusive right to use the marks in commerce for the goods and services identified.

175. Without Electrolux's consent, CD360 used in commerce reproductions, copies, and colorable imitations of the registered PUREPOUR Mark, including by displaying the mark in the text and headlines of sales listings, on product packaging, and on the product itself in connection with the advertising, promotion, offering, and sale of the Counterfeit Accused Product, a water filter cartridge.

176. CD360's Counterfeit Accused Product is identical or closely related to the services and goods for which the PUREPOUR Mark is registered, is offered through the same channels, and is directed to the same consumers.

177. CD360's use of the PUREPOUR Mark is likely to cause confusion, to cause mistake, and to deceive consumers and contractors as to the source, origin, sponsorship, affiliation, or approval of CD360's advertisements, sales listings, and goods, in violation of 15 U.S.C. § 1114(1).

178. The likelihood of confusion is confirmed by, among other things, the identity of the mark used by CD360, the relatedness of the parties' services and goods, the overlap in channels and consumers, and CD360's intent to trade on the goodwill of the PUREPOUR Mark.

179. CD360 has acted knowingly, deliberately, and willfully, with knowledge of Electrolux's rights in the FRIGIDAIRE Mark and PUREPOUR Mark.

180. Plaintiff has been harmed by CD360's infringing activities.

181. Plaintiff is entitled to recover monetary damages, including but not limited to CD360's profits, for the injuries arising from CD360's infringement.

182. CD360's conduct has caused and, absent relief, will continue to cause Plaintiff irreparable harm for which there is no adequate remedy at law.

183. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief.

**COUNT IX – TRADEMARK COUNTERFEITING**
**15 U.S.C. §§ 1114(1) & 1117(b)-(c)**

184. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

185. The standard-character mark FRIGIDAIRE is registered on the Principal Register under U.S. Reg. No. 616,196 for refrigerators, mechanical refrigerating apparatuses of all types both household and commercial, and parts thereof in International Class 11; and under U.S. Reg.

No. 7,850,190 for water filtration and purification units and replacement cartridges and filters therefor for use in refrigerators, freezers and combinations thereof in International Class 11.

186. Electrolux has used the FRIGIDAIRE Mark in commerce in connection with the goods identified in U.S. Reg. No. 616,196 continuously since prior to the date of registration and at all times thereafter.

187. Electrolux has used the FRIGIDAIRE Mark in commerce in connection with the goods identified in U.S. Reg. No. 7,850,190 continuously since prior to the date of registration and at all times thereafter.

188. Subsequent to registration of U.S. Reg. No. 616,196 (including on or after registration of U.S. Reg. No. 7,850,190 on July 1, 2025), CD360 intentionally used in commerce a counterfeit of the FRIGIDAIRE Mark, a spurious designation identical to the registered FRIGIDAIRE Mark, by displaying the FRIGIDAIRE Mark within the text and headlines of sales listings, on product packaging, and on the product itself in connection with the advertising, promotion, offering, and sale of the Counterfeit Accused Product, which is a good of the same type for which the mark is registered under U.S. Reg. No. 616,196 and under U.S. Reg. No. 7,850,190, and without Electrolux's authorization.

189. CD360 used the counterfeit FRIGIDAIRE Mark knowing it was counterfeit, and its use was intentional and willful within the meaning of 15 U.S.C. § 1117(b).

190. The standard-character mark PUREPOUR is registered on the Principal Register under U.S. Reg. No. 6,169,980 for water filtration and purification units and replacement cartridges and filters therefor for refrigerators, freezers and combinations thereof in International Class 11.

191. Electrolux has used the PUREPOUR Mark in commerce in connection with the goods identified in U.S. Reg. No. 6,169,980 continuously since prior to the date of registration and at all times thereafter.

192. On and after October 6, 2020, CD360 intentionally used in commerce a counterfeit of the PUREPOUR Mark, a spurious designation identical to the registered PUREPOUR Mark, by displaying the PUREPOUR Mark within the text and headlines of sales listings, on product packaging, and on the product itself in connection with the advertising, promotion, offering, and sale of the Counterfeit Accused Product, which is a good of the same type for which the mark is registered under U.S. Reg. No. 6,169,980, and without Electrolux's authorization.

193. CD360 used the counterfeit PUREPOUR Mark knowing it was counterfeit, and its use was intentional and willful within the meaning of 15 U.S.C. § 1117(b).

194. By reason of the foregoing, Plaintiff is entitled to enhanced and trebled damages or, at Electrolux's election, to statutory damages under 15 U.S.C. § 1117(c) for each counterfeit mark used for each type of good sold, in an amount up to the statutory maximum for willful use.

**COUNT X – FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION**
**15 U.S.C. 1125(a)**

195. Plaintiff incorporates the allegations set forth in Paragraphs 1-89 as if full set forth herein.

196. Electrolux owns valid and legally protectable rights in the FRIGIDAIRE Mark, arising from both its federal registrations and its continuous use of the mark in interstate commerce since at least as early as September 21, 1918 (including since at least as early as March 31, 2009).

197. CD360 used the FRIGIDAIRE Mark in commerce in connection with goods and services and made false or misleading designations of origin and false or misleading representations of fact, in a manner likely to cause confusion, mistake, or deception as to the origin,

sponsorship, affiliation, connection, or approval of Defendant's advertisements, landing pages, goods, and services, in violation of 15 U.S.C. § 1125(a).

198. Electrolux owns valid and legally protectable rights in the PUREPOUR Mark, arising from both its federal registrations and its continuous use of the mark in interstate commerce since at least as early as May 1, 2020.

199. CD360 used the PUREPOUR Mark in commerce in connection with goods and services and made false or misleading designations of origin and false or misleading representations of fact, in a manner likely to cause confusion, mistake, or deception as to the origin, sponsorship, affiliation, connection, or approval of Defendant's advertisements, landing pages, goods, and services, in violation of 15 U.S.C. § 1125(a).

200. In the foregoing, CD360 acted knowingly and willfully.

201. CD360 conduct has caused and will continue to cause monetary harm, entitling Plaintiff to monetary recovery.

202. CD360's conduct has caused and, absent relief, will continue to cause Plaintiff irreparable harm for which there is no adequate remedy at law.

203. A real and immediate threat remains that CD360 will continue its unlawful conduct absent injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant and grant the following relief:

A. A declaration and judgment in favor of Plaintiff that the Asserted Utility Patents are deemed valid and that Defendant has willfully infringed the Asserted Utility Patents under 35 U.S.C. § 271;

B. An award of damages under 35 U.S.C. § 284 to be paid by Defendant adequate to

compensate Plaintiff for Defendant's past infringement of the Accused Utility Patents, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts;

C. An award of treble damages under 35 U.S.C. § 284 in view of Defendant's willful infringement of the Asserted Utility Patents;

D. A declaration and judgment in favor of Plaintiff that the Asserted Design Patents are deemed valid and that Defendant has willfully infringed the Asserted Design Patents under 35 U.S.C. § 271;

E. An award of damages under 35 U.S.C. § 284 to be paid by Defendant adequate to compensate Plaintiff for Defendant's past infringement of the Accused Design Patents, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts;

F. An award of treble damages under 35 U.S.C. § 284 in view of Defendant's willful infringement of the Asserted Design Patents;

G. An award to Plaintiff of Defendant's profits under 35 U.S.C. § 289 for Defendant's past infringement of the Accused Design Patents, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts;

H. An order under 35 U.S.C. § 283 temporarily, preliminarily, and permanently enjoining and restraining Defendant, its agents, and anyone working for, in concert with or on behalf of Defendant from:

a. Directly or indirectly infringing the Asserted Utility Patents, including but not limited to by making, having made, importing, offering to sell, selling, or using the Counterfeit Accused Product;

b. Directly or indirectly infringing the Asserted Design Patents, including but not limited to by making, having made, importing, offering to sell, selling, or using the Counterfeit Accused Product;

I. A declaration and judgment in favor of Plaintiff that Defendant has infringed the FRIGIDAIRE Mark in violation of 15 U.S.C. § 1114; used a counterfeit mark within the meaning of 15 U.S.C. §§ 1114 and 1117 with respect to the FRIGIDAIRE Mark; and engaged in false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a) with respect to the FRIGIDAIRE Mark;

J. A declaration and judgment in favor of Plaintiff that Defendant has infringed the PUREPOUR Mark in violation of 15 U.S.C. § 1114; used a counterfeit mark within the meaning of 15 U.S.C. §§ 1114 and 1117 with respect to the PUREPOUR Mark; and engaged in false designation of origin and unfair competition in violation of 15 U.S.C. § 1125(a) with respect to the PUREPOUR Mark;

K. A declaration and judgment in favor of Plaintiff that Defendant's infringement, counterfeiting, and unfair competition with respect to the FRIGIDAIRE Mark and PUREPOUR Mark were willful;

L. A temporary, preliminary, and permanent injunction under 15 U.S.C. § 1116 enjoining Defendant and its officers, agents, servants, employees, affiliates, and all persons in active concert or participation with it from:

a. using the FRIGIDAIRE Mark or any confusingly similar term in any advertising, marketing, promotional material, product packaging, or product labeling;

b. otherwise using the FRIGIDAIRE Mark in any manner likely to cause confusion as to source, sponsorship, affiliation, or approval;

c. using the PUREPOUR Mark or any confusingly similar term in any advertising, marketing, promotional material, product packaging, or product labeling; and

d. otherwise using the PUREPOUR Mark in any manner likely to cause confusion as to source, sponsorship, affiliation, or approval;

M. An order requiring Defendant to account for and disgorge all profits and revenues derived from its unauthorized use of the FRIGIDAIRE Mark and the PUREPOUR Mark, pursuant to 15 U.S.C. § 1117(a);

N. An award of Plaintiff's actual damages together with Defendant's profits derived from its unauthorized use of the FRIGIDAIRE Mark and the PUREPOUR Mark, and the enhancement or trebling of such damages, under 15 U.S.C. § 1117(a)–(b);

O. In the alternative, and at Plaintiff Electrolux's election, an award of statutory damages under 15 U.S.C. § 1117(c) for each counterfeit mark used for each type of good, in an amount up to the maximum permitted for willful use;

P. An order under 15 U.S.C. § 1116(a) requiring Defendant to file with the Court and serve upon Plaintiff, within thirty days, a report in writing and under oath setting forth in detail the manner and form in which they have complied with the injunctions requested herein;

Q. A determination that this is an exceptional case and an award of Plaintiff's reasonable attorneys' fees and costs under 35 U.S.C. § 285 and 15 U.S.C. § 1117(a);

R. An award of pre-judgment and post-judgment interest at the maximum lawful rate; and

S. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,


*/s/ Alexis M. Buese*
Alexis M. Buese
Florida Bar No. 1028599
Bradley Arant Boult Cummings LLP
1001 Water Street, Suite 1000
Tampa, FL 33602
Phone: (813) 559-5511
Fax: (813) 229-5946
abuese@bradley.com

Stephanie D. Scruggs *(pro hac vice forthcoming)*
Virginia Bar No. 70288
Bradley Arant Boult Cummings LLP
1900 K Street NW, Suite 800
Washington, DC 20006
Phone: (202) 719-8224
sscruggs@bradley.com